Contracting, Incorporated v. Red Kirkendall & Associates Mr. Bergeron Bergeron, good morning your honors May it please the court in this case there was a denial of a motion for summary judgment an involuntary settlement that compromised most claims and a bench trial largely about that settlement the result was a 1.6 million dollar judgment against FCI for a design defect over which it had no control but had summary judgment been properly granted in this case liability would have been largely determined and that FCI would have prevailed in its claims against the parish and against SKA and those parties would not the remaining issues would have only been FCI's damages FCI's damages and St. Bernard Parish government's damages against SKA instead what the district court essentially held in this case was that FCI was the warrantor of SKA's work a principle soundly and explicitly rejected by Louisiana law so reversing the district court's denial of summary judgment here puts the parties in the correct posture to resolve the matter or at the very least to proceed to a trial if we were to decide the indemnity agreements expansive language allowed travelers to settle the case do you agree that would moot out any live controversy about the summary judgment not necessarily your honor and the reason is because there would still need to be a determination of liability or if in this case there was no determination of liability as this court has held intensely that would mean that travelers essentially would waive its ability to uh... collect against FCI by operation of uh... the spear and doctrine or of the uh... louisiana contractor immunity act which as we state in our brief was not effective at the time that the GAI was entered into between travelers and between FCI however that was existing in louisiana public policy which would make that indemnity improper so determining the summary judgment is still important and determining the summary judgment in FCI's favor would mean one that FCI was not liable FCI could not be held responsible for the fault of another but also that indemnity would be improper because indemnity in this case would be against louisiana law and public policy okay simplify that a little bit for me no indemnity here because no liability because this was a design defect that's correct your honor so the case that we rely on is tanksley versus gulf oil corporation cited by this case uh... cited by this court and the district court concluded not a design defect because your client should have read appendix one and had that been read closely the rotational conflict would have been seen essentially that's correct your honor that is the gist of the district court's denial of the motion for summary judgment uh... in tanksley what this court decided was that in the application of LOIA the louisiana oil field anti-indemnity act which is a sister statute of the LCIA the louisiana contractor anti-indemnity act is that a determination of liability is necessary uh... in order to determine whether that statute can apply and the reason is because those statutes do not allow a contractor or uh... uh... a contractor to be held responsible for the fault of another it cannot require a contractor to indemnify another for the fault of a third party and so what the what happened in tanksley was that the uh... underlying insurer or the surety i think it was uh... settled the claims prior to there being a determination of liability and then the surety or the insurer came back and said all right now you have to indemnify us because we paid this and we have an indemnity agreement and this court said well because you settled because you precluded a determination of liability or of responsibility then lawyer would have to apply because the only way that lawyer does not apply is if there is a determination that the indemnity or the third party was not at fault that's the reason that that's so important here and that's the reason that traveler settlement uh... is so important in that it cannot then come back and say ok fci you must now indemnify us but then getting back to the motion for summary judgment issue what the district court did was an error of law that's why the motion for summary judgment is reviewable uh... the appellees don't address the specific issues as to why the denial of the motion for summary judgment is reviewable but it's because it was predicated on an issue of law uh... and as there's no disputed facts it's just how you interpret this contract that's correct your honor there were no relevant disputed facts the district court did raise one uh... merely in dicta uh... that said uh... there could be the issue as to whether mister fusich had read the uh... the contract uh... read appendix one or not immaterial and the reason is because the question before the district court the question on fault is do the contract documents provide for a working system the answer is no the reason the answer is no is because the contract documents refer to a specific engine seven times the cat thirty five twelve c engine right because i read the district court reconciling all the parts the district court said you could have used the caterpillar engine you had to deliver pumps that were quote ready for operation so it was the obligation of the contractor if he were going to choose the caterpillar to make sure then the gear reducers worked the other way we disagree your honor and that is because as it relates specifically to the gear reducers the specification relating to the gear reducers say they are to be maintained in their rotational uh... direction uh... the way that the gear reducers specification is specifically listed and i can get you that that citation to the record but you don't dispute that the contract obligated your contract your client to deliver pumps that worked we do dispute that your honor we dispute that we dispute that because it is our position that the contract required the contractor to build according to the plans and specifications and something that wouldn't work the reason that it didn't work is because that's the way that it was designed and the SKA the designer here the engineer cannot pass off responsibility in fact Spearman specifically says this that a an engineer a designer cannot pass off responsibility onto a contractor by simply saying you make sure this works we've put all this together we've said how we think it's going to go but it's your responsibility to make sure this works that's not appropriate because then that makes the contractor the warrantor of uh... the plane you agree there's no design defect and it works even using the caterpillar engine specified if you reverse the direction of the gears if the direction of the gears that's ultimately what was done if the direction of the gears were called for to be reversed yes and then then we agree a hundred percent however the specific specifications of the right angle gear reducers say and this is undisputed the specific specifications of the sorry specific specifications of the right angle gear reducers say do not change the rotation and so when SKA advises FCI in the pre-bid meeting to buy this engine when the contract documents say seven times buy this engine when funding by FEMA is specifically okay slow down the contract doesn't say buy the engine it does say it specifies it seven times as to emission equivalence but nowhere in the contract does it say and no substitutions are allowed that is correct your honor we do concede that but then that's presents us with the issue that SKA is setting up a contractor to fail we cannot ignore the fact that it is undisputed SKA on multiple occasions made representations to FCI and others that the cat thirty five twelve C was the engine to be purchased we cannot ignore that the FEMA funding that's an oral statement but all the district did here was deny the motion the partial motion for summary judgment so whether Breeden CFO correct for SKA was it Breeden yes that's correct whether he did or didn't say buy the Caterpillar engine we don't know that it's it's undisputed it it is a fact that is an undisputed fact uh... the the SKA and everything that I've read in the record did not deny that did not dispute that uh... but even taking that out even that aside the fact that this engine is referenced in these contract documents and because the contract specifically says appendix one and appendix two are part of the contract documents how could any reasonable contractor justify purchasing any other engine what about what about the chronology and your client does submit the purchase orders prior to SKA writing back hey wait a minute make sure it all works the handwritten notes do it correctly but the orders had already gone in we we agree with that with that timeline your honor and I have two responses to that first of all that was SKA's response to everything relating to the engine but second as spear and holds that's not enough to shift liability off of uh... the designer off of the engineer by simply saying you make sure that this works the question is really was it appropriate for that's all that the motion for summary judgment asked was was it appropriate could FCI have purchased this engine the answer must be yes I know but the district court didn't say no the district court said yes but if you're gonna do it to fulfill your obligation to make it work you would then have to make a compensation and that's where the district court was wrong as a matter of law because that is the issue of contract interpretation that is where we get into the fact that doing everything that FCI was supposed to do resulted in a a project that would not function primarily because there was no directive to change the direction of the right angle gear reducers putting it slightly different way did the contract mandate FCI to purchase counterclockwise engines I do not think that it did your honor however the undisputed facts were that the only engines that would work in this case for this uh... this project had counterclockwise rotations Mr. Fusich in his declaration that was uncontroverted stated that the only rotation readings testified that it quote at least three other engines met the engine specifications and emission requirements so it wasn't just this there was testimony that there were other engines I was it would have met both emissions and specs I'm not aware of that your honor I don't uh... I don't think he said that I don't know your honor I don't I think they were uh... there was a significant issue particularly what Mr. Fusich brought up was the use of the cat thirty five twelve c as well as specific mentions of the engine family Mr. Fusich went back into and discussed the engine family meaning that there were certain uh... designations by FEMA as to what engines would work and which ones wouldn't and so there were no appropriate engines in this particular family uh... that would match this particular uh... but that just goes back to the issue of uh... of FCI being allowed I mean the policy here is that is that SKA an engineer can tell contractors can tell anyone hey yeah this is the engine this is the engine you're gonna use the engine we're gonna use the engine we've told everyone we're gonna use the engine we've told uh... DEQ LDEQ we've told FEMA we're gonna use this engine but if you purchase this engine it's your fault you're the one who messed all of this up and it's even it's even reinforced by the fact that the notice to bidders in this case instructed all of the bidders uh... to review the contract documents to see if they found any discrepancies and if they found any discrepancies they were to instruct uh... to advise SKA of all the bidders who were in attendance at the pre-bid meeting nobody pointed it out the record uh... the parish attached the notes from that pre-bid meeting to their motion for summary judgment it listed all the questions that anybody asked not a single person brought that up so if FCI was supposed to be able to find this and as we said in our brief that SKA is essentially requiring FCI to go and play a multi-million dollar game of Where's Waldo they expected them to find it something that SKA as the designer did not find and so as a matter of policy here and this gets to the Louisiana contractor immunity uh... law contractors cannot be held responsible for the fault of others so to the extent this is in any way the fault of SKA Louisiana law and public policy says that FCI cannot be held responsible that bears out through the indemnity as well because if travelers is going to be seeking indemnity for this settlement that it made precluding a finding of liability then law and public policy also prevents travelers from being able to recoup that money from FCI because there was no finding of liability and because if this court finds that SKA was at fault even a bit the contract immunity law is strong the uh... contractor anti-indemnity act is strong and FCI must be protected that is the law and public policy of the state of Louisiana now we do not waive any... what do you say about uh... your your clients uh... refusal to participate in the so-called technical meeting and also it's refusal to participate in the settlement conference your honor that's those are disputed that was borne out at trial a bit but essentially what Mr. Fusich's opinion was that everyone was trying to force him into this he knew that he had done nothing wrong he knew that he had the protections of Louisiana law and that contract was cannot... so the answer was not to participate the the answer and and we disagree that he didn't necessarily participate there was some testimony at trial that the specific uh... meeting that everyone was talking about Mr. Fusich had advised his his attorney that he was not available at that time there was other testimony that uh... he had simply refused to participate but it was Mr. Fusich's testimony at trial that he was unavailable he was always willing to talk settlement but the settlement that was being proposed to him by travelers and others were simply unreasonable simply unreasonable the magistrate judge calls a settlement conference and you just refused to show up is that right I don't know that that's necessarily what he did I did know that there was an issue that he was either he showed up or he didn't there can't be much dispute about that what does the record show I think the record shows that his and I see I'm out of time I think the record shows that his attorney uh... contacted the court and said that they were not available or that they wouldn't show up but I think there is a dispute as to his availability I reserve the remainder of my time for rebuttal thank you uh... yes you saved time for rebuttal thank you Mr. Bergeron Mr. Clary thank you your honor may it please the court Dale Clary on behalf of Shredd Kirkendall and Associates SKA to answer Judge Higginson's question Mr. Breeding did in fact testify there were other engines that were available he identified Caterpillar Mitsubishi and Cummings engines that could have rotated in either direction uh... so that is in the record I'm only going to address the motion for partial summary judgment that was denied by the trial court it was appropriately denied we're going to defer on the remaining issues to travelers and Mr. Krebs uh... particularly on whether or not the GAI gave travelers the legal authority to dismiss the claims against SKA the court did not exonerate SKA in denying the motion for summary judgment what the court merely said was that the contractor FCAI did not meet its obligations under the contract documents and there were several number one was read the dad gum things read the contract documents which he admits in his deposition he did not do and this was before the court in the motion for partial summary judgment appendix one had the rotations of the old gear appendix one had the rotation of the old engine an old marine engine by the way an old Deutsch German engine it was a marine engine as we know from maritime cases can rotate either way and that's in fact what they had there he didn't read the specifications that required him to coordinate the equipment between the equipment suppliers keep in mind this was a five million dollar contract with three point six million dollars worth of equipment you drafted it that we drafted the specifications that's correct and then the only engine described anywhere in there seven times is a particular one but when you read it he says your CFO reading said that's the one to use the specifications did not specify a particular engine and they cannot but it describes only one you read the whole thing it's the only engine ever mentioned in the engine specifications itself there is no saying that you're going to go it's not a model of clarity and if a contractor is looking at it thinking what engine you might logically think oh here's the one that passed the emission standard so my question to you is pursuant to the contract whose job was it to spot that oh that engine actually won't work the one that's mentioned seven times won't work whose job did the contract say keep in mind first the contract the engine specification and the gear specification did not specify rotation but so he's wrong in his original statement to say the gear was a locked in one way only rotation correct that's incorrect reading of the specifications so you're am I right that your position is the district courts that the Caterpillar engine was actually a usable it absolutely was usable and in fact it is it those four engines are in use today because all they did was change the gear on the on the change the rotation what should that contractor have done should have coordinated between his equipment his engines a supplier and his gear supplier that's part of the process of coordination it's a technical term the technical meaning is construction it's defined in the construct in the contract documents but it's also something that every general contractor should know and does know is that you have these two huge pieces of equipment that have to connect and as as Judge Ash said they have to be in complete testing and complete and operation operational and ready to go and he never had to talk to each other each of those two engines the engine supplier and the gear supplier both provided what they call submittals during the course of the project and even in anticipation of the project which on the first page of the Caterpillar submittal it said we rotate this way the third page of the Philadelphia gear submission said we rotate the other way he never looked at him he also never had them look at each other give them to each other when he sent the purchase orders out then you get involved and you're in did you spot it and say oh my goodness that's not gonna work I'm a lawyer oh you mean my SKA I'm sorry no he did not because the specifications didn't require either way and you can get engines that would go either way that goes back to what Mr. Breeding said in his affidavit about Mitsubishi Cummings and Caterpillar all have engines that can rotate in either direction so the actual direction selected by the contractor was not critical to the engineer because it wasn't in the specifications what was critical to the contractors obligation to do a complete operating system and make sure he coordinated between those two that was the contractors job and that's what he failed to do and that's what the trial court found in denying the motion for partial summary judgment and he even told us in open court Judge Asch did he said don't anybody do a happy dance just because I've made this ruling and that what he meant was this case is not over I'm just saying that there's no it is a genuine issue of material fact or there are obligations of the contractor that he did not meet and that's why the motion for partial summary judgment was properly denied thank you sir thank you Mr. Clary Mr. Krebs David Krebs your honors for travelers with me is Craig Mangum my partner um this case is not about the Spear and Doctrine this case is not about who was right and wrong on the specification this case is about the surety's right to settle a disputed claim that places it in jeopardy unilaterally and very early unilateral unilaterally and early yes your honor that's I agree the indemnity language is pretty broad but bond language isn't so broad but the bond language well the bond language is in fact a contract a tripartite contract between the obligee the the principal and the surety and so it contains obligations in there that to the obligee from the surety but the core document judge between fusage and travelers between a principal and the surety is a general agreement of indemnity that is the constitution of the the relationship and it is signed before any bond is ever issued it is the document the contract pursuant to which these bonds then are issued and travelers issued in the record reflects it 44 bonds pursuant relying on that general agreement of indemnity the general agreement of indemnity is ferocious and it is enforceable and the reason it is ferocious is because as surety you are in a precarious position when a claim is made yes but when my right that just chronologically your client's position was all the way till June 2019 this is a design defect case you were agreeing your honor I was going to try that position I was going to try that position I was gonna walk into judge ash and I was gonna put on the because Mr. Bergeron he was an excellent lawyer and a very honorable lawyer a pleasure to work with he is not a construction lawyer I've been a construction lawyer for 42 years my bias is towards the Spear and Doctrine I which is codified in New Orleans I mean in Louisiana at the 2771 I think title 9 the point is there was risk here there was risk all over this and I had a principal travelers had a principal who would not acknowledge that risk and who would not accept a commercially reasonable settlement a very favorable settlement Mr. Dale kicked in policy limits at the end $350,000 left on the depleting policy Mr. Jarrell who was representing the St. Bernard he put in 462,000 travelers put up 610,000 Mr. Fusage refused to deal whatsoever and was leading us to a judgment you could not a judgment I necessarily would have agreed with but one that judge ash would have brought down a judgment I believe from the signals I was getting a four and a half five million dollars we had an opportunity to settle this at a commercially reasonable place and I will spare you the public safety arguments and all of that leave all of that aside it made complete business sense not only for us but for but for Mr. Bergeron's client for Fusage help me again you've worked in this area a lot yes sir too simple a question but when I look at cases like LNA contracting the surety can't unilaterally settle until some actual liability is German or that's wrong that's wrong okay that's so when when's the point where you can settle because the indemnity language anytime you want so it's going to depend on the terms of the general agreement of indemnity okay and not the bond language that's not and not the bond language where is you can you tell me the case that clarifies that because on the bond language it looked to me like the parish that had to be the owner default and and obviously the guy was never paid because SKA doesn't certify it right yes yes so so the the cases judge there are there are numerous cases what's a helpful one you go on with the argument the argument will be helpful the the what I think is is helpful in the cases support this what what is what is helpful is the general agreement of indemnity itself the actual contract right and under that you can settle whenever you want under that we can settle whenever we want and there is and and there is no prohibition on unsettling early the contract says what the contract says section 4 has to do with settling claims against us in the point that I want to get to is section 6 which is a little bit more not a little bit more is more aggressive and it's something we hesitate before we do because you end up in this very court when you do it and that is settling their affirmative claims yeah how on earth do we have the right to do that we have the right to do that because the right is assigned to us in section 6 and then in addition under I think it's section 11 the section 11 we are granted the right as attorney in fact to exercise those I think I understand all that and just speak for a moment again just indulge me section 3 of the bond the parish complied with all the notice provisions it did it did so section 3 in in just to alert you yes the LNA case which was written by Judge Wisdom and every surety lawyer has it tattooed on his heart because it is a it's a fountainhead and it really addresses and it starts with the case turns on difference between a breach and a default that was in a 311 bond there are no there is no paragraph 3 this is a different bond it's a 312 the legal principles remain the same but it's a but it's a I just alert you to that when you when you're looking at the case so so the point is this in in judge ash got it it is it is in it is his conclusion of law 35 on and what he said was at bottom travelers rights rise under the GAI and are not affected by owner default within the meaning the bond or the prime contract that's a paraphrase on my part but the reason is that default is defined in all sorts of different ways you can look at the definition to default in the LNA case which I love you can look at the definition to default in a contract you can look at definition of default in the Louisiana Revised Statutes having to do with their we all know what a default is but but the technicalities of it depend on its context in in the terms in default within the meaning of the General Agreement of Indemnity is defined in the General Agreement of Indemnity and it is it is very clear that I'm looking to see if I have that written down judge it's in the definitions which is paragraph to the General Agreement of Indemnity default any of the following shall constitute a default cap the default a a declaration of contract default by any obligation doesn't have to be a formal declaration by a it doesn't have to be a proper declaration it has to be a declaration of default it goes on then to say an actual breach or abandonment of any contract because actual liability is something different from the owner saying that you in default so once the owner says it's in default the surety is at risk and these rights under the General Agreement of Indemnity are implicated and that's why I say we would did the parish say in default? I'm sorry say again how early did the parish say they're in default? we went around with them on that they when they first gave us notice in February of 2018 they didn't use the proper words they didn't we we we tend to rely a little bit judge on magic words because we have to. You're still disagreeing with them then? Yes. You're still saying it's a design defect? Well we didn't know then because we hadn't investigated we didn't know anything because the surety's not out there right the surety writes the bond and then takes the premium and does has no other problem unless until there's a problem so we're not part of the construction so our first notice was in February of 2018 and Miss Ziv Goldstein who was the claim handler responded in July after she picked up the phone she called she did all the things experienced claim handler would do trying to head things off. She responded in July of 2018 that there is no default termination that's the same time which he said to Mr. Fusich and it's part of his bad faith claim that she said man you ought to see if you can get out of this thing because it's gonna cost you a bunch of money he took that as pressure the judge did not find that it was pressure the judge found it as as what it was it's not in the record but I was sitting there it was a warning it was somebody who knows this I mean no disrespect but this game did and knows what the risks are and so the the default termination then came on July 20th 2018 in a letter from Mr. Cherrill and then years into this litigation and suddenly the issue was Mr. Cherrill unauthorized representative the court found that he was there is evidence to support that there's no showing of clear error on that but here's my legal point judge and that is this if I am right and I had the travelers had the ability to settle this claim when it did all these other arguments fall and the reason they fought I think the argument on considering the partial summary judgment interlocutory appeal that I think it's really clever I read it with a lot of interest but it doesn't apply here and why doesn't it apply here because when travelers settled this case it settled it settled the case under its power of attorney it was exercising fusages rights so to say that that in the exercise of fusages rights it legally it is the same as if fusage had settled the case and then came in and said well I did this but I mean I know that's not factually what happened but I think the legal effect is the same that case was settled by fusage through a power of attorney granted to travelers even though he objected to it so the first thing that falls is the whole motion for summary judgment argument the other thing that falls I can try to walk through the swamp that is the contractor anti-indemnity act and how that applies to the or does not apply to the surety but it does not it does not void indemnity agreements an indemnity agreement is not a collateral agreement under that act and I will tell you there's no case that specifically holds that but a collateral agreement has to be an agreement that's ancillary if you look at the cases particularly under the oil field act they make it clear that a general agreement of indemnity would not be the type of agreement that is a collateral agreement and I don't even know why I'm telling you that because he concedes Evan concedes that the act has no application so what he's really saying is that we couldn't settle because of the spearing doctrine that would be like saying that fusage can't settle its own disputed claim against it because we were you we were exercising fusages rights that had been assigned to us under a power of attorney and we signed that settlement on behalf of fusage under the power of attorney there was a separate settlement line for fusage so just to tie it up this is really about the surety's right to settle which is which is quite clear in in the case law and supported by the case law on bad faith I had a whole argument for bad faith but bad but I'm out of time and bad faith I commend to you the the courts the trial courts very careful very detailed factual findings of fact which are tied into the record in which were better than we we we could have done they did a better job with the facts than we did thank you very much for your patience Mr. Krabs Mr. Bergeron for rebel thank your honors I'll begin with the assertion about the right angle gear reducers there was some confusion and so to point the court specifically to it the right angle gear reducers are ROA the specifications are an ROA 1055 to 1057 and I made the assertion that it maintains it directs the contractor to maintain the rotation and the reason I say that is because section 1120 scope of work discusses the right angle gear reducers system performance provides that the proposed system will operate the same as the existing system unless modified therein subsection 201 of those specifications scope of work contains no mention of any reversal of a rotational direction so what they're essentially saying here is that okay FCI not only do you have to figure out the rotational direction of the engines you also have to figure out on your own that even though we don't tell you in these specifications you're gonna need a change the rotation of the right angle gear reducers you answered to me earlier that the contract didn't require FCI to buy counterclockwise engines that was that was left open that's correct your honor that that's correct but it was all of the combination of naming this specific engine the fact that this engine only had a drive shaft that rotated one way and the fact that this specific section does not describe or even contemplate changing the rotation of the right angle gear reducers is what makes it improper here second Mr. Mr. Clary says that there were available engines that would have that there would have functioned properly we were not made aware of those your honor we we essentially did what SKA told us to do it's easy for them to come back and say oh well you could have bought this one you could have bought this one in fact you should have bought these not withstanding what we told you to do you want to definitely save time because we don't even reach all this if the argument is correct that the surety here could settle this out and your honor as the surety argument they are arguing under essentially that a mandate was created power of attorney a mandate was created we know as black letter law that you cannot exercise a right of a mandate if that if the mandatory objects if the principal objects which is what happened here they're essentially saying you're giving us this mandate we can do whatever we want regardless as to whether you agree with it or not that's that's that's inappropriate giving you five million dollars but if things go wrong we get to settle the dispute well and and travelers with protected by the general there's all this discussion about there being risk right there being risk FCI understood that and was prepared to go forward travelers was supposed to be protected on the back end but travelers didn't even let us go to trial to determine whether there was an appropriate settlement is a discussion that is not entered into is a decision that is not entered into lightly and since FCI had its affirmative claims that it was pressing because FCI had the Louisiana contractor immunity statute that it knew was strong in its favor just so I'm understanding because you two have clearly litigated this for a long time your argument that travelers could not settle this is premised on some language you say reserved your right in the indemnity agreement is premised on language that undercuts the indemnity agreement bond or is premised on Louisiana law it's premised on Louisiana law your honor right and not the bond and not the indemnity correct however we do tell me the best case under Louisiana law that says they couldn't do the settlement at this one so your honor we didn't we didn't brief that issue we did not brief that issue because it was travelers if your argument is they didn't have the authority as a matter of law even though they did contractually tell me as clearly as you can in 53 seconds what the law is that made it against public policy it's the general provisions of the civil code as it relates to mandate those general provisions say that essentially the mandate the mandatory cannot take action that you just couldn't give them what he gave them in order to get their five million dollars. He could give them essentially that but that it was inappropriate for them to do this without his permission but we're getting back to the bond as well where as you brought up we have to get back to the bond we have to read the bond in conjunction with the GAI because Mr. Krebs said that there didn't have to be a formal declaration default or even a proper declaration of default well then how on earth are contractors supposed to understand when the GAI is going to kick in and when it's not as we argued at length in our brief the parish defaulted first and therefore the bond could not have been triggered. The parish defaulted first by not paying FCI. The SKA never even certified the request for payment because right they never even were asked to pay. We disagree your honor I see my time has expired but the payout was submitted. It's SKA's duty to certify the payout they didn't do that and so they weren't paid and that in itself is the breach because that is when they immediately assigned responsibility for the rotational conflict to FCI. Thank you. Thank you Mr. Bergeron. Your case is under submission. Last case for today.